**NEW JERSEY BANK (NATIONAL ASSOCIATION) a corporation of the United States of America**

v.

**COMMUNITY ASSOCIATION/FARMS, INC., a corporation; United States of America (Internal Revenue Service), and Recra-Del Corporation, formerly known as Pocono Farms, a corporation.**

**Appeal of COMMUNITY ASSOCIATION OF POCONO FARMS.**

No. 81–1335.

United States Court of Appeals, Third Circuit.

Argued Oct. 15, 1981.

Decided Dec. 7, 1981.

Sydney D. Walters, argued, Trenton, N.J., for appellant.

Kenneth L. Greene, argued, William S. Estabrook, Michael L. Paup, Attys., Tax Div., Dept. of Justice, John F. Murray, Acting Asst. Atty. Gen., Washington, D.C., William W. Robertson, U. S. Atty., Newark, N.J., for the U. S.

Charles J. Simoldoni, Washington, D.C., for N. J. Bank, N. A.

Before HUNTER, VAN DUSEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal arises from an interpleader action brought by the New Jersey Bank (the "Bank"). Two interpleaded parties claim the right to a reserve account (the "Fund") held by the Bank on behalf of Recra-Del Corporation ("Recra-Del"), the third interpleaded party. Both the Community Association of Pocono Farms (the "Association"), by way of a judgment lien against Recra-Del, and the United States,

by way of a tax lien against Recra-Del, claim the right to the entire interpleaded fund.

The Association appeals from an order of the United States District Court for the District of New Jersey granting summary judgment and the right to the entire interpleaded fund to the United States. Appendix at 10a. The court, in a letter opinion, ruled that, at the time of the Association's levy, the Fund was unliquidated, uncertain, and contingent, and therefore not subject to levy under the law of New Jersey. Because the Association's judgment lien was dependent upon the validity of the underlying levy, the court held that the Association did not secure a valid judgment lien. Appendix at 4a–9a.

This appeal raises the following issue: Did the lower court err in finding that, on the date of the Association's levy, the Fund was not "certain, noncontingent and liquidated,"[1] and, therefore, not subject to levy under the law of New Jersey?

We have reached the following conclusion: Under the applicable New Jersey case law, the Fund satisfied the requirements that it be liquidated, certain, and noncontingent on the date of levy. Second, and in the alternative, the Fund constituted a security interest under the law of New Jersey, and as such was subject to levy without meeting the above requirements.

Therefore, the judgment of the district court will be reversed.

*FACTS*

A. *The Fund*

Recra-Del was engaged in the business of selling recreational real estate. As consideration for each lot sold, Recra-Del received from the purchasers chattel paper, security agreements and instruments ("notes and contracts"). Recra-Del entered into a "Dealer's Agreement" with the Bank whereby the Bank would purchase the notes and contracts from Recra-Del for the net amount of each note or contract, less specified charges. Additionally, the Bank would

---

1. Appendix at 9a.

deduct and retain 10 percent of the net amount of each note or contract, which it placed in a non-interest-bearing reserve account. The reserve account was retained by the Bank as security for the performance by Recra-Del of its obligations under the Dealer's Agreement and as security for the payment by the real estate purchasers of the notes and contracts which the Bank now possessed. If a note or contract was not fully paid at maturity, the Bank had the absolute right to charge the unpaid balance against the reserve account. A "maximum reserve amount" was computed monthly by multiplying the total unpaid balance of all purchase notes and contracts by ten percent. If the net amount in the reserve account at the end of any month exceeded the maximum reserve amount, the excess, at the option of the Bank, could be refunded to Recra-Del, provided, however, that no refund could be made which would reduce the balance remaining in the reserve account below $100,000. Appendix at 15a. Upon full payment of all notes and contracts purchased by the Bank, and complete performance by Recra-Del of its obligations under the Dealer's Agreement, the balance remaining in the reserve account was to be paid to Recra-Del. On November 1, 1979, all notes and contracts held by the Bank had been paid in full, and the amount remaining in the reserve account was $130,-160.68. Appendix at 17a.

### B. The Association's claim

In 1974, the predecessor to the Association sued Recra-Del for breach of contract. A settlement agreement was entered into, and, as collateral for its performance, Recra-Del executed a judgment note in the amount of $510,000 payable to the Association's predecessor. Appendix at 17a. That judgment was entered on January 19, 1976, by the Prothonotary of the Court of Common Pleas of Monroe County, Pennsylvania. In 1977, the Association commenced an action against Recra-Del in the Superior Court of New Jersey based upon the unpaid balance of the judgment.[2] On December 8, 1977, a default judgment was entered against Recra-Del in the amount of $489,-137.40, together with costs of $110.25. Appendix at 18a.

A writ of execution directed to the Sheriff of Passaic County was issued by the Superior Court on February 3, 1978. Pursuant to the writ, the Sheriff, on March 3, 1978, served a levy on the Bank in the amount of $510,884.22.[3] On the date that this levy was served, the Bank's obligation under the Dealer's Agreement to Recra-Del was limited by the Bank's right to charge against the reserve account all unpaid notes or contracts. On June 20, 1978, the Association filed a motion with the Superior Court seeking to force the Bank to pay the Sheriff the monies, debts, rights and credits due from it to Recra-Del. An order was issued on July 21, 1978, directing the Bank to pay to the Sheriff on November 1, 1979, the sum of $131,347.33, or any sums of money held by the Bank in the reserve account as of November 1, 1979.[4] *Id.*

### C. The claim of the United States

The Commissioner of Internal Revenue determined that Recra-Del had underpaid its federal income tax for the year ending March 31, 1972. On October 2, 1978, a deficiency of $618,189, plus interest of $259,660.19 and a penalty of $30,909, for failure to pay tax, was assessed against Recra-Del. Notice and demand for payment was made on Recra-Del on the same date. A notice of federal tax lien was filed at the Prothonotary's Office in Monroe County, Pennsylvania, on December 19, 1978, and on March 27, 1979, the United

---

**2.** The Association had received only $32,000 from Recra-Del when the New Jersey action was instituted. Appendix at 18a.

**3.** The Sheriff calculated this amount by adding interest and certain fees to the December 8, 1977 judgment for $489,137.40. Appendix at 36a.

**4.** The sum of $131,347.33 was the amount in the reserve account on the date the order was signed. November 1, 1979, was the date on which payment was to be complete on all notes and contracts purchased by the Bank.

States served a notice of levy on the Bank. Appendix at 19a.

### D. Court proceedings

On February 8, 1980, the Association filed a motion with the Superior Court of New Jersey seeking to compel the Bank to pay the monies held in the reserve account to the Sheriff. The Bank filed a cross-motion seeking an order allowing it to deposit the money with the Clerk of the Superior Court. The Superior Court denied the Association's motion and granted the Bank's motion on February 22, 1980. On March 7, 1980, the Bank deposited the balance remaining in the reserve account, or $130,-160.68, with the Clerk of the Superior Court. Appendix at 19a–20a.

The Bank filed a complaint in interpleader with the Superior Court of New Jersey on March 7, 1980. The matter was removed to the United States District Court for the District of New Jersey at the petition of the United States. The United States, the Bank, and the Association entered into a stipulation of facts, and on the basis of this stipulation the United States and the Association each moved for summary judgment. Appendix at 4a–5a. The district court found that the Association did not have a valid lien under New Jersey law prior to the filing of the notice of federal tax lien by the United States, and, therefore, the United States was entitled to the entire interpleaded fund. Accordingly, the court granted summary judgment to the United States. Appendix at 9a.

### DISCUSSION

### PART I

There is a paucity of case law in New Jersey on the question at issue here. Nevertheless, two decisions of New Jersey courts provide an insight into the relevant New Jersey law.

In *Cohen v. Cohen*, 126 N.J.L. 605, 20 A.2d 594 (Sup.Ct.1941), the then-Supreme Court[5] enunciated the requirements for obtaining a levy. The plaintiff in *Cohen* sought to satisfy a judgment against Mrs. Cohen by levying against a sum owed her by an insurance company pursuant to a policy held by her deceased husband. The sum was to become payable to Mrs. Cohen ten years after the death of her husband, but only if Mrs. Cohen was alive on that date.

The court found that this sum was not subject to levy. In order to be subject to levy, the court noted, such a right or credit must be liquidated, certain, and noncontingent. "A debt which is uncertain and contingent, in the sense that it may never become payable, is not subject to levy and sale." 126 N.J.L. at 610, 20 A.2d at 596. The court concluded:

> Since the money will not be due and payable to defendant if she is not alive on July 7, 1945, the debt is altogether too uncertain and speculative to permit of a "fair appraisement and sale" and is, therefore, not presently subject to levy and sale under our execution laws.

*Id.*

The *Cohen* decision was addressed by Judge Haneman[6] of the Appellate Division in his dissent in *Picker v. Bayonne*, 60 N.J. Super. 251, 158 A.2d 692 (Super.Ct.App.Div. 1960), *aff'd*, 33 N.J. 390, 165 A.2d 182 (N.J. 1960). In *Picker*, an agreement existed between the City of Bayonne and a contractor for the construction of a swimming pool. The terms of the agreement were strikingly similar to those in the instant case: the city retained ten percent of any payments made to the contractor, these funds to be held in the event that repairs were found necessary or the contractor defaulted on any of his obligations under the agreement. The plaintiff, who had obtained an unrelated judgment against the contractor, sought to levy against this retained fund. Competing with the plaintiff for the right to the fund

---

**5.** At that time, the Supreme Court was an intermediate court. The highest court of the state was the Court of Errors and Appeals. In 1948, the court system was restructured; since that date, the highest court of New Jersey has been named the Supreme Court.

**6.** Judge Haneman was later elevated to the Supreme Court of New Jersey.

was a materialman who had not been paid for supplies delivered to the contractor to be used in constructing the swimming pool.

The majority in *Picker* did not discuss the technical validity of the levy nor the requirements of *Cohen*. Rather, it concluded that, because of the special nature of a contract for the construction of a public improvement, an equitable trust existed on behalf of materialmen and suppliers of the contractor, with the fund held by the city as trustee. Because of their contribution to a public improvement, the court found that these suppliers should have priority over an unrelated judgment creditor.

Judge Haneman, dissenting, rejected the majority's trust analysis and entered into a discussion of the validity of the levy under the relevant New Jersey law, including the decision in *Cohen*. He argued that the levy was not valid insofar as it sought to attach funds due the contractor for work he had not performed as of the date of the levy:

> The debts, in satisfaction of which those [post-levy] payments were made, were then contingent upon performance of additional work or the furnishing of additional material by [the contractor] as required by the terms of his contract with [the city].

60 N.J.Super. at 261, 158 A.2d at 698.

However, with respect to funds retained by the city from payments made to the contractor for work performed before the date of the levy, Judge Haneman reached a different conclusion. His analysis of the validity of the levy against retained funds is most applicable to the instant case:

> When the levy was made on April 19, 1956, [the city] had in its hands monies due [the contractor] in the amount of $3,899.07. This represented ten per cent of the monies due [the contractor] for "work [theretofore] satisfactorily completed" by him under the contract. This sum was retained to compensate the municipality for "repairs" to the work so completed and for "any amount paid by

the Municipality ... by reason of the Contractor ... having failed to assume the obligations and responsibilities required by this contract." [The city] was indebted to [the contractor] on April 19, 1956 in the amount of $3,899.07. *This debt was certain and liquidated. It was subject only to a possible offset for repairs required to be made and for noncompliance with the obligations and responsibilities required under the contract between the date of retention and the final completion and acceptance of the work performed.*

60 N.J.Super. at 262, 158 A.2d at 698 (emphasis supplied).

█ Judge Haneman's analysis was not disputed by the majority, nor is there any reason to conclude that it was not an appropriate application of the relevant New Jersey law.[7] We find this analysis applicable in the instant case. On the date of the Association's levy, the Bank held $136,-752.81 in the retained Fund. "This debt was certain and liquidated. It was subject only to a possible offset ... for noncompliance with the obligations and responsibilities required under the contract." *Id.* As in *Picker*, the events giving rise to the debt had taken place *before* the date of the levy. Only if the members of the Association defaulted on their obligations would the Bank be entitled to reduce the already existing debt to Recra-Del.

The cases cited by appellee, in which no levy was permitted, do not alter our analysis. *See, e.g., Zane v. Brown*, 126 N.J.Eq. 200, 8 A.2d 367 (Ch. 1939); *Riegelhaupt v. Russo*, 13 N.J.Misc. 278, 177 A. 878 (Hudson County Ct. 1935). In these cases, no levy was allowed because, unless some significant event occurred subsequent to the levy, no debt would arise. In the instant case, as in *Picker*, the debt has already arisen and will remain *unless* some significant event occurs. While in *Cohen* the court noted that a levy could not stand when the debt

---

**7.** The reviewing court did not treat the issue discussed in Judge Haneman's dissent. *See*

*Picker v. Bayonne*, 33 N.J. 390, 165 A.2d 182 (N.J.1960).

"may never become payable," [8] this statement is inapplicable to the instant case. Here, the debt was certain to become payable, although the final amount was subject to reduction after the date of levy. Furthermore, at the time of the levy, the debt was subject to certain and unambiguous description. It was capable of attachment pending any needed reduction by the Bank. It possessed the qualities of traditional levy targets, and we hold that the Association's levy was valid under New Jersey law.

## PART II

By virtue of the adoption in 1962 of the Uniform Commercial Code (UCC), New Jersey law provides an alternative ground for supporting the validity of the Association's levy. The UCC was designed to bring the body of commercial law into the contemporary world of business. N.J.Stat.Ann. § 12A:1–102 (West). It eliminated the arcane labeling of transactions which often produced varied and conflicting rules of law. Common law classifications such as the chattel mortgage, the conditional sale, or the trust receipt were replaced with a general set of rules for the creation of a security interest:

> Chapter 9 applies to any transaction, regardless of its form, intended to create a security interest in personal property and fixtures, including goods, documents, instruments, general intangibles, chattel paper, accounts receivable and contract rights. It also applies to a sale of accounts receivable, contract rights and chattel paper. . . . Chattel mortgages, conditional sales, factors' liens, [and] trust receipts are abolished. So are the common law pledge, lease or consignment of goods intended as security. All are replaced with the "security interest". . . . The new all embracing security device means an interest in personal property or fixtures which secures payment or performance of an obligation and it covers every known type of security device if the collateral is subject to Chapter 9, i.e. personal property or fixtures.

Introductory Commentary, N.J.Stat.Ann. § 12A:9 at 312 (West).

8.  126 N.J.L. at 610, 20 A.2d at 596.

As defined in N.J.Stat.Ann. § 12A:9–105(h) (West), a security agreement means "an agreement which creates or provides for a security interest." The appropriate test is enunciated in *In re Maple Contractors, Inc.*, 172 N.J.Super. 348, 353, 411 A.2d 1186, 1189 (Super.Ct.Law Div. 1979):

> The basic requirements for the creation of a valid security interest are (1) a security agreement must be entered into; (2) the agreement must be in writing or the creditor must be in possession of collateral; (3) the debtor must have rights in collateral and (4) the secured party must have given value.

In the instant case, these requirements have been met. Recra-Del sold certain property to a group of purchasers; Recra-Del retained an interest in the property in the form of chattel paper, security agreements, and instruments. This interest was sold to the Bank in return for cash in the amount of ninety percent of the value of the discounted notes. The remaining ten percent was placed on deposit with the Bank as a guarantee fund, or reserve account. It was the intention of the Bank and Recra-Del to create a security interest. Paragraph 5 of the Dealer's Agreement specifically states that the Bank, for each note or contract purchased, shall deduct and retain a reserve percentage of ten percent, which shall be placed in a "Reserve Account" bearing no interest, in the name of Recra-Del, "as security for the performance by [Recra-Del] of [its] obligations to [the Bank] . . . and on all Notes and Contracts purchased by [the Bank]." Appendix at 22a.

The Dealer's Agreement was in writing, signed by the debtor, Recra-Del, and by the Bank on March 29, 1971. Appendix at 24a. The creditor Bank was in possession of the collateral; the debtor had rights in the collateral, as it was Recra-Del's money that was placed in the Fund.

Because an agreement creating a security interest was executed, a specific provision of the UCC permits the judgment creditor Association to reach Recra-Del's interest in the Fund:

> Alienability of Debtor's Rights: Judicial Process. The debtors rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, *levy*, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default.

N.J.Stat.Ann. § 12A:9–311 (West) (emphasis supplied). The purpose of this section, according to the New Jersey Uniform Commercial Code Comment, is to make clear that in all security transactions under the Article, the debtor has an interest which he can dispose of and which his creditors can reach. N.J.Stat.Ann. § 12A:9–311 at 478 (West). In keeping with this purpose, the Association should be allowed to reach the Fund.

## CONCLUSION

The Fund satisfied the requirements set forth in the New Jersey case law for creating a valid levy. Moreover, as a security interest under the statutory law of New Jersey, the Fund is subject to levy. Thus, the Association's levy, and, therefore, its judgment lien, were valid, and take priority over the tax lien of the United States.

Accordingly, the judgment of the district court will be reversed.

